IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                           CR No. 16-1701 JCH

AARON MERCADO-GRACIA,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Aaron Mercado-Gracia's Motion to Suppress Evidence (ECF No. 47). The Court held a hearing on the motion on November 7, 2017, and on May 1, 2018. The Court, having considered the motion, briefs, evidence, applicable law, and otherwise being fully advised, concludes that the motion to suppress should be denied.

## I.    FACTUAL BACKGROUND

New Mexico State Police ("NMSP") Officer Ronald Wood has been an officer for 11 years and a canine ("K-9") officer for four-and-a-half years. Nov. 7, 2017 Hr'g Tr. 5:4-6:3. Although Ronald Wood has been promoted to Sergeant since the incident, at the time he was a Senior Patrolman, so the Court will refer to him herein as Officer Wood. *Id.* In September 2013, Officer Wood received K-9 training from the United States Custom and Border Patrol ("CBP") K-9 School where he was certified as a handler. *Id.* 6:24-7:6. In 2015 and 2016, Officer Wood received additional training in advanced patrol techniques, advanced K-9 handling, K-9 instruction, and a K-9 detection instructor course. *See id.* 7:6-11:10.

For the last four-and-a-half years, Officer Wood has been assigned a Belgian Malinois named Arras who was certified in drug detection beginning in September 2013 by three agencies: CBP, NMSP, and the California Narcotics Canine Association ("CNCA"). *See id.* 11:18-19:15; May 1, 2018 Hr'g Tr. 189:24-190:2. Arras was certified each year thereafter, and at the time of the incident in question, Arras held NMSP and CNCA certifications for the detection of the odors of marijuana, cocaine, heroin and methamphetamines. *See* Nov. 7, 2017 Hr'g Tr. 11:18-19:15; May 1, 2018 Hr'g Tr. 184:20-188:10; Gov.'s Ex. 2, 3A-D, 4A-D. The certification process is designed to simulate real world scenarios. Nov. 7, 2017 Hr'g Tr. 14:13-16:8.

Officer Wood generally had Arras with him for his approximately 8-12 hours per shift and Arras returned home with Officer Wood, so Officer Wood was very familiar with Arras's demeanor and behavior. *See id.* 13:6-14:12. Officer Wood trained with Arras 16 hours a month in addition to regular obedience training. *Id.* In his time as a K-9 officer, he has conducted approximately 500 stops in which he seized some type of contraband, with approximately 150 of those stops resulting in a seizure of narcotics in amounts not for personal use. *Id.* 6:4-19.

An alert is a behavioral change that a drug detection dog exhibits when his nose gets into the target odor he is trained to detect, which may include a change in search direction, a change in search speed, a change in body posture, and/or a change in breathing pattern. *See* May 1, 2018 Hr'g Tr. 181:10-25, 183:15-184:19. When a dog detects an odor for which he is trained, his respiration typically becomes deeper, his mouth will close to put more air through the olfactory nose system, and his sniffing pattern changes. Nov. 7, 2017 Hr'g Tr. 19:21-25; May 1, 2018 Hr'g Tr. 183:15-184:11. A drug detection dog is also trained to have a final response – a trained indication separate from an alert. *See* Nov. 7, 2017 Hr'g Tr. 20:22-25; May 1, 2018 Hr'g Tr. 182:11-17. Examples of an active final response include barking at the source of the odor or

scratching/digging at the source of the odor, while examples of a passive final response include sitting or lying down, and staring at the source of the odor. *See* May 1, 2018 Hr'g Tr. 182:18-183:4. The common element of the active and passive final responses is the stare behavior. *Id.* 182:25-183:4.

Arras is an energetic dog who makes rapid movements typical for the Belgian Malinois breed. *See* Nov. 7, 2017 Hr'g Tr. 86:22-87:2; May 1, 2018 Hr'g Tr. 190:111-191:5. Arras's alert is to close his mouth, increase his respiration through his nose, and to either become a little more rigid, a little more frantic, and/or it may be accompanied with a change of direction. Nov. 7, 2017 Hr'g Tr. 20:5-21, 145:2-6. Arras's final response is to go into a half sit/squat, with a pinpoint stare towards the source of the odor, and then typically he barks several times. *Id.* 20:22-22:9, 146:9-13.

On March 25, 2016, Officer Wood was traveling westbound on Interstate-40 with Arras when he observed a silver Dodge Charger traveling eastbound on I-40 seemingly driving faster than the posted 75 miles per hour speed limit. *Id.* 34:21-36:1. Officer Wood engaged his properly tested and working radar, which showed the vehicle speed was 92 mph, so he turned around, caught up to the vehicle, and stopped the vehicle by activating his emergency lights. *See id.* 36:17-41:8. The vehicle stopped on the shoulder to the highway, and Officer Wood approached the passenger side. *Id.* 41:6-7, 45:10-14. A video camera in Officer Wood's patrol vehicle recorded the stop. *Id.* 37:24-39:6.

The driver spoke English and appeared to understand Officer Wood throughout the encounter. *See* Gov.'s Ex. 6 ("Video of Stop"). Officer Wood explained to the driver, later identified as Defendant Mercado-Gracia, that he was going 92 mph, asked for his license and vehicle registration, and asked him to come over to the police vehicle while he checked

Defendant's identification. Gov.'s Ex. 7 ("Tr. of Stop") 2:7-14, ECF; Video of Stop 11:58 a.m. It is Officer Wood's common practice to ask motorists to exit their cars and accompany him to his patrol vehicle because his computer is in his vehicle and he can ask questions as they arise. Nov. 7, 2017 Hr'g Tr. 48:7-24. Officer Wood stood in the doorway of his patrol unit next to the passenger side front seat while Defendant stood by his passenger side front tire on the opposite side of his passenger door from Officer Wood. *Id.* 49:4-16. Officer Wood observed that Defendant was fidgeting, moving around, but engaged with Officer Wood as he talked to him. *Id.* 49:17-25. It is normal, however, for the traveling public to be fidgety when Officer Wood first stops them. *Id.* 50:18-21.

Defendant provided an Arizona driver's license for Aaron Mercado-Gracia and a vehicle registration matching the stopped Dodge Charger. *Id.* 46:12-47:7. The vehicle registration showed the car was registered to Hector Ramirez Reyes. *Id.* At this point, Officer Wood became concerned that that name on the license did not match the registration. *See id.* 47:1-12.

Officer Wood then asked about ownership of the vehicle because it was unclear from the paperwork Defendant provided. *See id.* 51:10-24. In response to Officer Wood's question who owned the vehicle, Defendant said, "Huh?" Tr. of Stop 2:16-18. When Officer Wood repeated his question, Defendant answered, "My cousin." *Id.* 2:19-20. Defendant gave his cousin's name as "Favian." *Id.* 2:21-25. Officer Wood observed that the insurance card had the name Favian Reyes, so he asked Defendant what Favian's last name was. *Id.*; Nov. 7, 2017 Hr'g Tr. 52:5-14; Gov.'s Ex. 8. When Defendant could not provide Officer Wood with Favian's last name, he clarified, "Well, he's my lady's, uh, husband's cousin." Video of Stop at 11:59 a.m. Defendant said Favian let him borrow his car to come over here for the weekend, and when asked where he was heading, Defendant responded, "Albuquerque." Tr. of Stop 3:5-8. Officer Wood found

Defendant's answers regarding who owned the car confusing, and he was suspicious that Defendant did not know the last name of Favian, with whom he claimed a family tie of sorts, or in any event, someone with whom he had a relationship of trust to allow him to borrow the vehicle for a long trip. *See* Nov. 7, 2017 Hr'g Tr. 52:18-53:11. Officer Wood further found it suspicious that Defendant was driving a vehicle registered to Hector Ramirez Reyes but insured by Favian Reyes, which in his mind, made the true ownership of the car unclear. *See id.* 54:12-21.

While writing the citation, Officer Wood engaged Defendant in casual conversation. *Id.* 55:6-13. Officer Wood asked what brings him to Albuquerque, and the following exchange occurred:

| | |
|---|---|
| Defendant: | Just I own my own business – |
| Officer Wood: | Do you? |
| Defendant: | Yeah. It's a remodeling company. I'm trying to just like get going at it. |
| Officer Wood: | So you're coming to Albuquerque for work? |
| Defendant: | Oh no, just so I can drive around. |
| Officer Wood: | Drive around? |
| Defendant: | Yeah. I have a lady over here I want to meet. |
| Officer Wood: | Oh, okay. Well, I thought your lady was over there. This was her cousin's car. |
| Defendant: | Yeah, I know. |
| Officer Wood: | Oh, okay. |
| Defendant: | (Inaudible) girl down here. |
| Officer Wood: | I see. |
| Defendant: | So I couldn't bring my car. |
| Officer Wood: | Ah, I see. How long are you going to be over here? |
| Defendant: | Where? |
| Officer Wood: | Albuquerque. |
| Defendant: | Who, me? |
| Officer Wood: | Yeah. |
| Defendant: | How long have I been here? |
| Officer Wood: | No. How long are you going to be over here? |
| Defendant: | Oh, I don't know. It depends. Probably just the weekend. |
| Officer Wood: | Ah. |
| Defendant: | Yeah. I have to go back to work Monday. I would like to make it back by Easter. |

Tr. of Stop 3:12-5:2; Video of Stop 12:00-:01 p.m.

Officer Wood found Defendant's answers to why he was going to Albuquerque odd. Nov. 7, 2017 Hr'g Tr. 55:18-56:22. He found it strange Defendant would mention his business, but when asked if he was coming for work, he said he was just driving around, even though Albuquerque is a long way to come from Phoenix to merely drive around. *Id.* He then found it suspicious that Defendant gave a new answer for why he was in town – to see a lady. *See id.* 56:19-57:2. At this point, Defendant became increasingly fidgety, antsy, moving his hands and feet around, although at this stage he was still looking at Officer Wood for the most part when answering questions. *Id.* 57:3-10. Officer Wood additionally noticed that Defendant was answering his questions, which should have had easy answers, with a question, and based on his training, was an attempt for the brain to buy time to fabricate a response. *Id.* 57:15-58:21. Phoenix is also a known source city and distribution point for narcotics. *Id.* 154:18-21.

Officer Wood then checked the VIN on the car, completed the rest of the traffic citation, and explained the process to resolve the speeding citation. Tr. of Stop 5:4-6:2; Video of Stop 12:02-:04 p.m.; Nov. 7, 2017 Hr'g Tr. 60:10-62:9. Officer Wood checked the VIN to verify it matched the paperwork, which it did, and according to NCIC, the vehicle was not stolen. Nov. 7, 2017 Hr'g Tr. 60:17-61:7, 123:13-24. It is possible, however, to have a stolen vehicle that has not been reported stolen to NCIC. *Id.* 150:5-8. He handed Defendant his license and vehicle information and said, "Okay. You're free to go." Tr. of Stop 6:3-6; Nov. 7, 2017 Hr'g Tr. 62:10-15. The time between when Defendant stopped his car and Officer Wood issued him the citation for speeding was approximately seven minutes. *See* Video of Stop 11:57 a.m.-12:04 p.m.

At that point, Defendant walked toward his vehicle. *Id.* at 12:04 p.m. When Defendant was near the rear of his vehicle, *see id.*, the following exchange occurred:

| Officer: | Excuse me, Aaron. |
| Defendant: | Yeah? |
| Officer: | Is it okay if I ask you some questions? |
| Defendant: | What? |

Tr. of Stop 6:8-12. Defendant then walked toward Officer Wood who was standing near the passenger door of his vehicle. *See* Nov. 7, 2017 Hr'g Tr. 62:19-64:7.

| Officer: | Is it okay if I ask you some questions? |
| Defendant: | Regarding? |
| Officer: | Huh? Well, I'm just a little confused, is all, on your travel here, your trip. It's a little confusing to me, you know what I mean? |

Tr. of Stop 6:13-19. Officer Wood's tone of voice was cordial and friendly. Video at 12:04 p.m.

Officer Wood then asked Defendant questions about whether he personally owns a car and why he did not bring it, and Defendant replied that he has a car but that's the only car "we have at home." Tr. of Stop 6:21-7:4. Officer Wood was confused because his answer indicated his lady had the car back in Phoenix, but Defendant just said he was coming to Albuquerque to meet a lady. Nov. 7, 2017 Hr'g Tr. 65:10-17. Officer Wood inquired whether he has a wife or girlfriend. Tr. of Stop 7:5-7:10. Defendant replied it was his partner, they had only one car, and he was here to see a girl. *See id.* 7:3-18. Officer Wood asked where in Albuquerque he was going, to which Defendant responded that he did not know and that he had to call and meet her. *Id.* 7:19-22. Officer Wood asked for the woman's name, and after asking why he needed to know, Defendant gave a first name. *Id.* 7:23-8:15. Officer Wood asked where he was going to stay, to which Defendant revealed that he was going to rent a place and pay cash, because he did not bring his credit cards. *Id.* 8:24-9:7. Officer Wood inquired if the owner of the car knew Defendant had his car and knew he was driving to Albuquerque with it, and he replied yes to both questions. *Id.* 9:9-24.

Officer Wood found Defendant's answers suspicious and improbable because it was odd

to go to the trouble of borrowing a car and driving seven hours from Phoenix to Albuquerque without knowing where he was going or where he was staying, and without bringing his credit cards, even if he did not intend to use them. *See* Nov. 7, 2017 Hr'g Tr. 65:10-68:10. In his experience, Officer Wood found the inconsistencies in Defendant's answers not normal in contrast to the answers of the innocent motoring public with whom he usually dealt. *See id.* 68:16-20. Defendant had also become increasingly nervous, such that now when answering Officer Wood's questions, he would look down or away without making eye contact. *Id.* 69:20-70:2. Based on his training and experience, Officer Wood found that the lack of eye contact corresponded with people trying to hide their answers or being untruthful with their answers. *Id.* 70:23-71:5. Defendant's answers were also slow, as he took long pauses before responding to simple questions. *Id.* 70:2-4. All this behavior was unusual for the innocent motoring public, who usually became more relaxed as the traffic stopped continued. *See id.* 69:20-70:22. Officer Wood had also noticed that Defendant's keyring had only one key, which is unusual because the common motoring public generally have multiple keys, key rings, or cards with their car key. *See id.* 78:6-20.

Officer Wood asked if he had any weapons in the car, to which Defendant said, "No." Tr. of Stop 10:1-4. Officer Wood asked this question for officer safety reasons, given Defendant's nervousness and inconsistent answers, and because he might be able to eliminate nervousness due to a weapon in the car as a factor to explain Defendant's demeanor and answers. *See* Nov. 7, 2017 Hr'g Tr. 68:16-69:17.

Officer Wood then asked if there were any drugs in the vehicle, to which Defendant said, "No." *Id.* 71:6-9. When asked if he had any marijuana, Defendant replied, "Not that I'm aware of." Tr. of Stop 10:8-9. When Officer Wood inquired about other drugs, Defendant responded

no. *Id.* 10:13-17. At this point, Officer Wood was suspicious that Defendant was transporting marijuana, because it is an odorous drug, and he had control of the vehicle for a seven-hour drive from Phoenix, so he should know whether marijuana was in the car. Nov. 7, 2017 Hr'g Tr. 71:8-72:8. Officer Wood believed that Defendant was giving a half truth, trying to distance himself from the possibility. *Id.* Moreover, it is common, based on his experience, for drug smugglers not to know where they are going, but to have only partial information, such as a phone number to call, and to use vehicles that do not belong to them. *See id.* 154:21-156:7.

Officer Wood asked for permission to search the vehicle. *Id.* 79:3-14. Defendant replied, "No," and when asked why, Defendant explained that he "thought it was just my ticket." Tr. of Stop 11:3-6. Officer Wood attempted to clarify by asking if he did not want the vehicle or his own property searched, but Defendant said, "The whole thing" and "I know I have the right." *Id.* 11:9-12:1. At 12:08 p.m., Officer Wood responded, "No, definitely, you do. So I'll be straight up with you. Right now I have some concerns, okay? And so what I'm going to have to do is I'm going to deploy my canine on the vehicle, okay?" *Id.* 12:2-6. He then explained that he was going to deploy his dog on the exterior of the vehicle because of concerns he had that Defendant's travel plans did not make sense, but he did not further elaborate on his reasons when Defendant asked about them. *See id.* 12:8-13:25. Defendant looked into the patrol unit and his eyes widened, seemingly scared, that the dog was there to search. Nov. 7, 2017 Hr'g Tr. 80:1-10.

At 12:10 p.m., Officer Wood patted Defendant's pockets for weapons and had him stand away from the vehicle while he conducted the dog sniff. *See* Tr. of Stop 14:11-22; Video of Stop 12:10-:11 p.m. Officer Wood conducted the pat-down for officer safety reasons because his attention would be on his dog, and he did not feel safe turning his back on a suspect that had not been patted for weapons. Nov. 7, 2017 Hr'g Tr. 82:22-83:10. Officer Wood radioed for

assistance and at around 12:13 p.m., Officer Wood deployed Arras for about two minutes. *See* Video of Stop 12:12-:14 p.m.

Officer Wood kept Arras on a leash because of the heavy, fast traffic on the driver side of the vehicle. Nov. 7, 2017 Hr'g Tr. 84:20-86:5. He made two complete circles around the vehicle, beginning at the front of the vehicle and moving counterclockwise. *Id.* 88:14-96:19; Video of Stop 12:12-:14 p.m. This two-lap technique is standardly taught within the law enforcement community; the first lap is the dog's search by sniffing with minimal handler influence, if possible. May 1, 2018 Hr'g Tr. 197:2-21. The purpose of the second lap is for the handler to present a search pattern for the dog, for example, showing the seams of car doors in a high/low search pattern. *Id.* 197:22-198:15. Because the second lap involves more handler influence, the first lap is generally the best lap for a dog alert/final response. *Id.* 198:16-20.

In Officer Wood's first pass of the car, he provided less input to Arras, using a longer leash. *See* Nov. 7, 2017 Hr'g Tr. 88:14-89:13. As they passed the driver's side door, Arras got up on the window, closed his mouth, and took several breaths through his nose, which indicated to Officer Wood that he smelled something that got his attention. *Id.* 90:9-19. At the driver's side rear taillight, Arras closed his mouth, took several rapid breaths, changed directions, and came back toward Officer Wood, breathing rapidly. *Id.* 91:1-17. Arras's body posture changed, he became excited, and changed direction back toward the taillight. *Id.* This behavior was consistent with Arras's alert behavior, and at this point, Officer Wood reasonably believed Arras had alerted to the presence of narcotics. *See id.* 90:13-94:1; May 1, 2018 Hr'g Tr. 201:6-205:10, 212:6-21, 214:2-6.

Arras then pinpoint stared at the taillight and barked strongly and rhythmically four times. Nov. 7, 2017 Hr'g Tr. 91:18-92:3; May 1, 2018 Hr'g Tr. 202:1-203:7. The four barks

differed in type and repetitiveness from Arras's earlier high frequency whine. *See* May 1, 2018 Hr'g Tr. 200:22-24, 202:7-203:7. This behavior was consistent with Arras's final response behavior, and at this point, Officer Wood reasonably believed Arras gave a final response indicating the presence of narcotics in the vehicle. *See* Nov. 7, 2017 Hr'g Tr. 91:1-93:15; May 1, 2018 Hr'g Tr. 213:2-6, 214:2-6. Arras continued on, changing direction again at the passenger side rear taillight and focused on the trunk area, part of his bracketing behavior. *See* Nov. 7, 2017 Hr'g Tr. 93:22-94:13; May 1, 2018 Hr'g Tr. 203:15-204:23. Approximately ten minutes passed from the time Officer Wood issued the speeding ticket to Arras's alert and final response, for a total detention time of approximately 16 minutes from the initial stop of the car to Arras's alert and final response. *See* Video 11:57 a.m. – 12:13 p.m.

In the second pass, Officer Wood used a more detailed, guided pattern pass where he presented the seams of the doors and trunk to Arras, showing Arras where to sniff on a shorter leash. *See* Nov. 7, 2017 Hr'g Tr. 94:25-96:6; Video of Stop 12:13 p.m. Arras took rapid breaths through his nose and quickly flashed back his head at the driver's side rear taillight, but he did not give another indication or final response in the second pass. *See* Nov. 7, 2017 Hr'g Tr. 94:25-96:16. When Officer Wood began walking back to return Arras to his patrol unit, Arras attempted to get back to the driver side's rear taillight, indicating his trying to be obedient to the odor. *See id.* 98:16-99:9; May 1, 2018 Hr'g Tr. 209:14-210:14; Video 12:13-:14 p.m.

Officer Wood subsequently told Defendant the dog alerted, and that Defendant was going to go with Officer Wood while he applied for a search warrant. Tr. of Stop 14:24-15:2; Nov. 7, 2017 Hr'g Tr. 108:7-17. Officer Wood handcuffed Defendant and placed him in the rear of his patrol unit. Nov. 7, 2017 Hr'g Tr. 109:1-12. Officer Wood took Defendant's wallet, money, and ID at around 12:15 p.m. *See* Tr. of Stop 15:5-22; Video of Stop 12:15 p.m. Defendant asked to

use the restroom, but Officer Wood did not allow him at that time. Tr. of Stop 15:23-25.

Sergeant Arcenio Chavez (now Lieutenant) arrived on scene, spoke to Defendant, and explained the process of what was going to happen next. Nov. 7, 2017 Hr'g Tr. 164:3-170:3. A high school student in plain clothes accompanied Sergeant Chavez but stayed in the vehicle. *Id.* 175:6-178:25. Sergeant Chavez and Defendant were outside of the patrol unit and Defendant was handcuffed. *Id.* 171:3-18. Among other things, Sergeant Chavez explained that they were going to go the office to apply for a search warrant, which would take a long time, but that if he changed his mind, he could let them know, and that it was totally up to him. *Id.* 169:13-170:3. Defendant indicated to Sergeant Chavez that he changed his mind about the search. *See id.* 172:20-173:4.

Sergeant Chavez then told Officer Wood Defendant wished to give consent to search. *Id.* 173:3-8. Officer Wood un-cuffed Defendant and allowed him to get his jacket from the Charger. *Id.* 110:4-111:11. Officer Wood then gave Defendant a consent-to-search form, Officer Wood explained the form to Defendant, Defendant read it, Defendant said he understood it, and Defendant signed it. *Id.* 111:24-113:25; Tr. of Stop 16:22-17:15; Gov.'s Ex. 10. At the time Defendant signed the form, he was not handcuffed and was standing at the passenger side front door of the patrol unit. Nov. 7, 2017 Hr'g Tr. 114:20-115:1. Officer Wood then allowed Defendant to use the bathroom. *Id.* 115:2-8.

Sergeant Chavez and Officer Wood searched the interior of Defendant's car where they found two large bundles of heroin and a firearm. *Id.* 115:8-9, 174:7-21. The United States subsequently charged Defendant in a two-count Indictment (ECF No. 12) for Possession with Intent to Distribute 1 Kilogram and More of Heroin under 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime and

Possessing a Firearm in Furtherance of Such Crime under 18 U.S.C. § 924(c). On July 10, 2017, Defendant filed a motion to suppress (ECF No. 47) challenging the legality of the detention and search.

## II.    ANALYSIS

Defendant contends Officer Wood violated the Fourth Amendment by extending the traffic stop beyond its initial purpose of issuing a speeding ticket without reasonable suspicion. Defendant asserts that he did not voluntarily consent to further detention or to the search of the vehicle. Finally, Defendant argues that the Government failed to prove the reliability of Arras or that he alerted and made a final response to establish probable cause to search the car.

### A.  Reasonableness of Investigative Detention during Issuance of Citation

An investigative detention is an exception to the probable cause requirement, the reasonableness of which is determined by a two-part test: (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)).  An investigative detention may only last as long as necessary to effectuate its purpose. *Florida v. Royer*, 460 U.S. 491, 500 (1983).  The scope of the detention must be carefully tailored to its underlying justification. *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003). It is the Government's burden to show that a seizure was sufficiently limited in scope and duration to satisfy the conditions of an investigative detention. *Royer*, 460 U.S. at 500.

During a routine traffic stop, an officer may ask questions, examine documentation, run computer checks of the vehicle, and issue citations. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001). Questioning, even unrelated to the purpose of the stop, including

asking about illegal items, does not offend the Fourth Amendment, so long as it does not appreciably lengthen the detention. *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007) (citing *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006)). "[Q]uestions about travel plans are routine and 'may be asked as a matter of course without exceeding the proper scope of a traffic stop.'" *West*, 219 F.3d at 1176 (quoting *United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996)). After an officer has issued a citation, the driver must be allowed to leave if he has produced a valid license and proof he is entitled to operate the car. *Zubia-Melendez*, 263 F.3d at 1161.

Defendant does not contest the validity of the initial stop to issue a speeding citation. The Court concludes that the approximately seven-minute period during which Officer Wood issued the ticket, and checked NCIC and the VIN to ensure the vehicle was not stolen, while asking questions of Defendant including about his travel plans, was reasonable. *See West*, 219 F.3d at 1176; *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995) ("an officer may detain a driver until assured that the driver's license is valid and the driver is legitimately operating the vehicle").

### B. Voluntary Consent to Answer Questions

After the officer has issued a citation, the driver generally must be allowed to proceed on his way, unless the officer has a reasonable, articulable suspicion that illegal activity has occurred or is occurring or the driver consents to additional questioning. *See West*, 219 F.3d at 1176. "A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official." *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999) (quotation omitted). A seizure, by contrast, occurs when an individual has an objective reason to believe that he is not free to end the conversation with the

officer and leave. *Id.* The Tenth Circuit follows the "'bright-line rule that an encounter initiated by a traffic stop *may not* be deemed consensual unless the driver's documents have been returned to her.'" *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308-09 (10th Cir. 2006) (quoting *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005)) (italics in original).

"Valid consent is that which is "freely and voluntarily given.'" *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). The court must determine whether (1) the consent was unequivocal, specific, and freely and intelligently given, and (2) it was given without implied or express duress or coercion. *See United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997). The government bears the burden to show that the consent was voluntary. *Patten*, 183 F.3d at 1194. Mere acquiescence to a claim of lawful authority is insufficient to meet the government's burden. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968). "The central question is whether 'a reasonable person would believe he was free to leave or disregard the officer's request.'" *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (quoting *Manjarrez*, 348 F.3d at 885-86). A police officer does not have to inform the citizen that he is free to disregard any further questioning for the encounter to be consensual. *See West*, 219 F.3d at 1176-77.

At the time Officer Wood asked Defendant if he could ask him some more questions, Officer Wood had returned Defendant's documents to him and told him he was free to go. Officer Wood did not use an overbearing show of authority, he spoke in a friendly manner, and he let Defendant walk back towards his own car. He was the only officer present on the side of a public interstate, did not display a weapon, did not touch or restrain Defendant, and did not stand in his way. Defendant responded to Officer Wood's request with "regarding," walked back toward Officer Wood, and proceeded to answer Officer Wood's questions. This continued

encounter between Defendant and Officer Wood while Officer Wood asked additional questions was consensual. *Cf. West*, 219 F.3d at 1176-77 (affirming district court's conclusion that encounter between suspect stopped for traffic violation was consensual after officer returned papers before questioning him about drugs, and officer did not use commanding or threatening manner or tone of voice, display a weapon, or touch suspect). Defendant did not act or express intent to affirmatively end the consensual encounter at any time before Officer Wood told him he would employ his dog around the car.

### C.  Reasonableness of Investigative Detention to Conduct Dog Sniff

A canine sniff of an already legitimately detained vehicle is not an unlawful search within the meaning of the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (a canine sniff of the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests); *United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998). Detention of a suspect to accomplish a canine sniff is generally permissible if supported by reasonable suspicion. *See Hunnicutt*, 135 F.3d at 1347, 1350 (holding, in alternative, that 15 minute wait for drug dog was permissible because supported by reasonable suspicion, including extreme nervousness of passengers and inconsistent statements about destination). For reasonable suspicion to exist, the officer must have "some minimal level of objective justification for making the stop," and evidence "falling considerably short of a preponderance satisfies this standard." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (quotations and citations omitted). Dubious, inconsistent answers to questions or implausible or contradictory travel plans can contribute to reasonable suspicion. *Zubia-Melendez*, 263 F.3d at 1162.

In this case, the following articulable facts gave Officer Wood reasonable suspicion that criminal activity was afoot. Defendant gave inconsistent, odd answers to Officer Wood's

questions that were atypical of his encounters with the general public when issuing tickets. Defendant gave multiple, inconsistent reasons for the purpose of his trip to Albuquerque from Phoenix, a known drug source city. It was suspicious that Defendant would mention his business, but when asked if he was coming for work, he said he was just driving around, even though Albuquerque is a long way to come from Phoenix to merely drive around. Adding to Officer Wood's reasonable suspicion was the fact that Defendant gave a new answer for why he was in town – to see a lady, and that he was driving all the way to Albuquerque to meet her, but he did not know where and had to call her. *See United States v. Karam*, 496 F.3d 1157, 1164-65 (10th Cir. 2007) ("[C]onfusion about details is often an indication that a story is being fabricated on the spot…."). Defendant's latter story was consistent with drug smugglers who often have to call to meet up with their contacts. It was additionally unusual that Defendant left his credit cards at home for a long out-of-state trip.

Defendant also changed his answer for whom the car belonged from "my cousin" to "my lady's husband's cousin." Defendant could only give a first name for the car's owner, even though he suggested Favian had a family tie and loaning a car for an out-of-state trip would generally indicate a trusted relationship. Although the name "Favian" matched the first name on the insurance card, there was a different name on the registration. In Officer Wood's experience, drug traffickers often do not use their own vehicles to transport drugs. *Cf. United States v. Ludwig*, 641 F.3d 1243, 1249 (10th Cir. 2011) (explaining that driving vehicle registered to third party who was not present is factor that is relevant in reasonable suspicion analysis because it may indicate vehicle is stolen or involved in drug trafficking).

Additionally, Defendant became increasingly nervous during the course of the encounter, later avoiding eye contact and answering questions slowly and with questions instead of answers

to Officer Wood's simple questions. Although nervousness generally is of limited significance, Officer Wood explained that usually the public becomes less nervous as the stop proceeds, whereas Defendant became more nervous. Based on Officer Wood's training, he understood answering easy questions with questions was a sign that the person is trying to stall to give the brain time to fabricate an answer. Finally, when asked if marijuana was in the car, Defendant responded, "Not that I'm aware of," an unusual response given that he had been in the car for many hours and marijuana has a strong, distinct odor. Moreover, based on Officer Wood's experience, usually the innocent motoring public answers this question in a straight way, whereas Defendant did not say "no" and attempted to distance himself from the possibility, indicating he may be somebody who either does or is around people who use marijuana. *See* Nov. 7, 2017 Hr'g Tr. 71:8-72:8. Vague and evasive answers may be considered as part of the totality of the circumstances in the reasonable suspicion analysis. *Karam*, 496 F.3d at 1165.

Based on all the facts, Officer Wood developed reasonable suspicion during the encounter to believe Defendant may be engaged in criminal activity, to wit, the transportation of illegal narcotics. He could constitutionally detain Defendant for a reasonable length of time to conduct a dog sniff to investigate his articulable suspicion that Defendant might be transporting drugs. *See United States v. Turrentine*, 542 F. App'x 714, 716, 719-20 (10th Cir. Oct. 18, 2013) (holding that district court did not err in finding that trooper had reasonable suspicion to further detain suspects to conduct dog sniff based on clearly contradictory travel stories and passenger's efforts to feign sleep); *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007) (implausible travel plans, significant nervousness, and use of rental car gave rise to reasonable suspicion of drug trafficking); *United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir. 1995) (finding reasonable suspicion justifying continued detention where defendant's explanation of

travel plans and purpose was not plausible; driver said he was driving from California to North Carolina merely to take dilapidated sofa to friends, he was uncertain as to where in North Carolina he was going, and answers were inconsistent with passenger's responses, which were also internally inconsistent).

Furthermore, the time between the initial stop and when Officer Wood conducted the dog sniff around the vehicle was approximately 16 minutes, which is not unreasonable under the circumstances. *See United States v. Montes*, 280 F. App'x 784, 789 (10th Cir. 2008) (unpublished opinion) (holding that total time of traffic stop before dog's initial alerts – 15 minutes – is within reasonable range and citing with approval cases ranging from 13 to 19 minutes) (and cases cited therein).

### D. Probable Cause to Search

A warrantless arrest does not violate the Fourth Amendment so long as an officer has probable cause to believe that the arrestee committed a crime. *Rife v. Oklahoma Department of Public Safety*, 854 F.3d 637, 645 (10th Cir. 2017). Probable cause to search a vehicle under the automobile exception to the Fourth Amendment's warrant requirement is established if, under the totality of the circumstances, there is a fair probability that the vehicle contains contraband or evidence. *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001). A reliable narcotics dog alerting establishes probable cause for searches and seizures. *See United States v. Rosborough*, 366 F.3d 1145, 1152-53 (10th Cir. 2004) (canine alert toward one area of vehicle generally gives probable cause to search other areas of vehicle).

The Court finds the testimony of Officer Wood and Terry Fleck credible. The testimony and evidence established that Arras had extensive training in drug detection, was certified in drug detection beginning in September 2013 by three agencies, and at the time of the search in

question, held NMSP and CNCA certifications for the detection of the odors of marijuana, cocaine, heroin and methamphetamines. The Court finds that Arras was fully trained and certified to detect narcotics and was reliable at the time of the incident in question. *Cf. United States v. Villa*, 348 F. App'x 376, 379 (10th Cir. Oct. 6, 2009) (holding that alert by drug-detection dog established probable cause to search rental vehicle where district court found dog reliable based on facts that dog had completed certification for three years prior to search of rental vehicle and was fully trained and certified to detect narcotics at the time it alerted).

The Court further finds that Arras alerted and gave a final response during Arras's first lap around Defendant's vehicle. Officer Wood testified credibly that he heard Arras's change of respiration, and saw up close his closing of his mouth and his change in body posture. The video clearly shows Arras changing direction multiple times at or near the driver's side taillight. The evidence additionally demonstrates that Arras paused at the driver's side taillight, closed his mouth, stared fixedly at the taillight, and barked rhythmically four times. Officer Wood credibly testified that this behavior constituted Arras's alert and final response.

Although defense expert Andre Jimenez testified that passive alerts, such as a sit, are more common than active alerts, he acknowledged in his report that a trained alert may include barking. *See* Def.'s Ex. D (Report of Andy Falco Jimenez) ¶ 7 ("A reaction or trained alert would have included barking *or* other trained behavior such as sit, down or aggressive alert by scratching.") (italics added). He also noted that a behavior change, such as a sudden change of direction, change in breathing, or change in body language may tell a handler that the dog was interested in an odor. *See id.* ¶ 9.

Terry Fleck, who the Court found at the hearing to be an expert in law enforcement K-9 subject matter, persuasively corroborated Officer Wood's testimony. Mr. Fleck testified to his

opinion that Arras alerted by closing his mouth, changing his search direction, and engaging in bracketing behavior. *See* May 1, 2018 Hr'g Tr. 212:6-24, 219:21-220:7. Mr. Fleck further opined that Arras engaged in a final response at the driver's side rear taillight in his first lap around Defendant's car when he focused on the driver's side taillight with a pinpoint stare and gave four rhythmic barks. *Id.* 213:2-6, 220:8-14.

Based on the totality of the circumstances and for the foregoing reasons, Officer Wood had a reasonable basis for his belief that Arras alerted to and had a final response indicating the presence of illegal narcotics in Defendant's vehicle. Accordingly, Officer Wood had probable cause to search the vehicle, and he proceeded to search the vehicle in a reasonable period of time. The subsequent discovery of the drugs and firearm therein did not violate Defendant's Fourth Amendment rights.[1]

**IT IS THEREFORE ORDERED** that Defendant Aaron Mercado-Gracia's Motion to Suppress Evidence (**ECF No. 47**) is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**

---

[1] Because of the Court's findings and conclusions, it need not determine whether Defendant's consent to search the vehicle was voluntary, as an alternative ground to permit the search.