# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                            CR No. 16-1701 JCH

AARON MERCADO-GRACIA,

       Defendant.

## MEMORANDUM OPINION AND ORDER

On February 26, 2019, the United States filed a "Motion in Limine to Admit Summary Charts Pursuant to Fed. R. Evid. 1006 and Fed. R. Evid. 801(d)(2)(E), and Fed. R. Evid. 801(d)(2)(A)" (ECF No. 189). Defendant argues the non-voluminous originals are the best evidence and summary exhibits are not necessary. Defendant also asserts that the extraction data lacks foundation and contains hearsay. The Government disclosed numerous conversations between Defendant and others that it intends to admit at trial and argues they are not hearsay under Rule 801(d)(2)(E) and/or they contain statements which fall under other exceptions to the hearsay rule. Defendant argues that the Government has not established by any independent evidence that the March 4-6 and March 19-21, 2016 trips were for the purpose of drug trafficking or that there is independent evidence of any conspiracy with "Favian."

This Court held a hearing on the motion on March 12, 2019 (hereinafter "James hearing," *see United States v. James*, 590 F.2d 575 (5th Cir. 1979)). This Court, having considered the motion, briefs, objections, evidence, applicable law, and otherwise being fully advised, makes the

following findings of fact and conclusions of law regarding the admissibility of the co-conspirator statements and grants in part and denies in part the motion as described herein. The Court's rulings on admissibility are subject to the foundation set forth by the Government in the hearing and in the briefs being properly laid at trial with admissible evidence.

## I.    LEGAL STANDARD

### A.    Summary Rule

Federal Rule of Evidence 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Federal Rule of Evidence 1001(d) defines an "original" of electronically stored information as "any printout—or other output readable by sight—if it accurately reflects the information." The information upon which the summary is based must itself be admissible, though it need not be admitted. *United States v. Channon*, 881 F.3d 806, 810 (10th Cir. 2018).

The Tenth Circuit has "held that it is within the discretion of the Trial Court, absent abuse working to the clear prejudice of the defendant, to permit the display of demonstrative or illustrative exhibits admitted in evidence both in the courtroom during trial and in the jury room during deliberations." *United States v. Downen*, 496 F.2d 314, 320 (10th Cir. 1974). The Tenth Circuit stated "that the submission of papers, documents or articles, whether or not admitted in evidence, to the jury for view during trial or jury deliberations, accompanied by careful cautionary instructions as to their use and limited significance, is within the discretion accorded the Trial Court in order that it may guide and assist the jury in understanding and judging the factual controversy." *Id.* at 321.

**B.      Authentication**

To authenticate an item, its proponent must produce enough evidence to support a finding that the item is what the proponent says it is. *United States v. Arnold*, 696 F. App'x 903, 906 (10th Cir. June 23, 2017) (quoting Fed. R. Evid. 901(a)). "When 'evidence is unique, readily identifiable and relatively resistant to change, the foundation need only consist of testimony that the evidence is what its proponent claims.'" *United States v. Yeley-Davis*, 632 F.3d 673, 683 (10th Cir. 2011) (quoting *United States v. Johnson*, 977 F.2d 1360, 1367 (10th Cir. 1992)).

**C.      Hearsay**

Hearsay is a statement that "the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(1)-(2). "But testimony not offered to prove the matter asserted that is 'offered instead for *relevant* context or background' is not hearsay." *United States v. Becknell*, 601 F. App'x 709, 712 (10th Cir. 2015) (unpublished opinion) (quoting *United States v. Hinson*, 585 F.3d 1328, 1336 (10th Cir.2009)). Questions and comments do not constitute hearsay if they are not offered to prove the truth of the matter but are offered to show their effect on the other person in the conversation and provide context. *See United States v. Smalls*, 605 F.3d 765, 785 n. 18 (10th Cir. 2010).

"A party lays the proper foundation for the trustworthiness of computer generated business records and the records are admissible, in the following circumstances: (1) The records must be kept pursuant to some routine procedure designed to assure their accuracy, (2) they must be created for motives that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must not themselves be mere accumulations of hearsay or uninformed opinion." *United States v. Fernandez*, 392 F. App'x 743, 745-46 (11th Cir. 2010) (internal

quotations omitted). Information automatically generated by a computer without the assistance or input of a person is not hearsay because there is no statement nor declarant involved within the meaning of 801. *United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005). *See also United States v. Lamons*, 532 F.3d 1251, 1262-64 (11th Cir. 2008) (finding that data showing date, time, and connected phone numbers are "statements of machines, not statements of persons," therefore not "statements" under Fed. R. Evid. 801(a)).

Although hearsay statements are generally not admissible at trial, *see* Fed. R. Evid. 802, a statement that "was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay, and therefore may be admissible as substantive evidence against the party, Fed. R. Evid. 801(d)(2)(E). For a statement to be non-hearsay under Rule 801(d)(2)(E), the district court must first find the following elements by a preponderance of the evidence: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made during the course of and in furtherance of the conspiracy. *United States v. Rutland*, 705 F.3d 1238, 1248 (10th Cir. 2013). The elements of conspiracy, in turn, are: (1) there was an agreement to violate the law; (2) the declarant knew the essential objectives of the conspiracy; (3) the declarant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent. *Id.* at 1249 (citing *United States v. Ailsworth*, 138 F.3d 843, 850-51 (10th Cir. 1998)). The government, as the proponent of the evidence, has the burden of proving the relevant preliminary facts. *United States v. Perez*, 989 F.2d 1574, 1580 (10th Cir. 1993).

The government does not have to prove an express or formal agreement was made; rather, it merely has to show the coconspirators tacitly came to a mutual understanding. *Rutland*, 705 F.3d at 1250. "The existence of a conspiracy may be inferred from circumstantial evidence." *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987). Interdependence means the

coconspirators were united in a common goal or purpose. *Ailsworth*, 138 F.3d at 851. The trial witness need not be a co-conspirator, so long as the declarant is a co-conspirator with the defendant against whom the statement is being offered. *See United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995).

When making a determination under Rule 801(d)(2)(E), the court "may consider both independent evidence and the statements themselves." *Rutland*, 705 F.3d at 1248. To satisfy Rule 801(d)(2)(E), the United States need show only that there is "some independent evidence linking the defendant to the conspiracy." *Martinez*, 825 F.2d at 1453 (relying on *Bourjaily v. United States*, 483 U.S. 171 (1987)). "[S]uch independent evidence may be sufficient even it is not 'substantial.'" *United States v. Owens*, 70 F.3d 1118, 1125 (10th Cir. 1995) (quoting *United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993)). Independent evidence is any "evidence other than the proffered [coconspirator] statements themselves." *Owens*, 70 F.3d at 1125 (quoting *Martinez*, 825 F.2d at 1451).

With regard to the third element under Rule 801(d)(2)(E), "in furtherance" means that the statements are "intended to promote the conspiratorial objectives." *Rutland*, 705 F.3d at 1252 (quoting *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007)). Examples of statements the Tenth Circuit has held to be in furtherance of a conspiracy include

> statements explaining events of importance to the conspiracy, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, statements identifying a fellow coconspirator, and discussions of future intent that set transactions to the conspiracy in motion or that maintain the flow of information among conspiracy members.

*Id.* (internal quotations and citations omitted). Additionally, statements identifying members of a conspiracy, discussing particular roles of other coconspirators, and avoiding detection by law enforcement personnel are made "in furtherance of" a conspiracy. *Williamson*, 53 F.3d at 1520.

"A coconspirator statement is made during the course of the conspiracy it if is made before the objectives of the conspiracy have either failed or been achieved." *Owens*, 70 F.3d at 1126 (quoting Perez, 989 F.2d at 1579).

Rule 801(d)(2)(E) requires the trial court to make findings on the record regarding the elements before admitting coconspirator's out of court statements. *See Perez*, 989 F.2d at 1581. The "strongly preferred order of proof" in determining the admissibility of an alleged coconspirator's statement is to first hold a hearing outside the presence of the jury to determine whether the party offering the statements has established the existence of a conspiracy by a preponderance of the evidence. *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994). At the hearing, the district court has discretion to consider "any evidence not subject to a privilege, including both the coconspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial." *Owens*, 70 F.3d at 1124.

## II.     Whether evidence is hearsay

### A.     Findings of Fact Regarding Co-Conspirator Statements

In making these findings, the Court has considered the content of the alleged co-conspirator statements themselves, as well as independent evidence of the existence of the conspiracy.

This Court held hearings on the motion to suppress filed in this case on November 7, 2017, and on May 1, 2018, after which the Court made the following findings of fact relevant to the issues herein:

> On March 25, 2016, Officer Wood was traveling westbound on Interstate-40 with Arras when he observed a silver Dodge Charger traveling eastbound on I-40 seemingly driving faster than the posted 75 miles per hour speed limit. [Nov. 7, 2017 Hr'g Tr.] 34:21-36:1. Officer Wood engaged his properly tested and working radar, which showed the vehicle speed was 92 mph, so he turned around, caught up to the vehicle, and stopped the vehicle by activating his emergency lights. *See id.*

36:17-41:8. The vehicle stopped on the shoulder to the highway, and Officer Wood approached the passenger side. *Id.* 41:6-7, 45:10-14. A video camera in Officer Wood's patrol vehicle recorded the stop. *Id.* 37:24-39:6.

The driver spoke English and appeared to understand Officer Wood throughout the encounter. *See* Gov.'s Ex. 6 ("Video of Stop"). Officer Wood explained to the driver, later identified as Defendant Mercado-Gracia, that he was going 92 mph, asked for his license and vehicle registration, and asked him to come over to the police vehicle while he checked Defendant's identification. Gov.'s Ex. 7 ("Tr. of Stop") 2:7-14, ECF; Video of Stop 11:58 a.m….

Defendant provided an Arizona driver's license for Aaron Mercado-Gracia and a vehicle registration matching the stopped Dodge Charger. *Id.* 46:12-47:7. The vehicle registration showed the car was registered to Hector Ramirez Reyes. *Id.* At this point, Officer Wood became concerned that that name on the license did not match the registration. *See id.* 47:1-12.

Officer Wood then asked about ownership of the vehicle because it was unclear from the paperwork Defendant provided. *See id.* 51:10-24. In response to Officer Wood's question who owned the vehicle, Defendant said, "Huh?" Tr. of Stop 2:16-18. When Officer Wood repeated his question, Defendant answered, "My cousin." *Id.* 2:19-20. Defendant gave his cousin's name as "Favian." *Id.* 2:21-25. Officer Wood observed that the insurance card had the name Favian Reyes, so he asked Defendant what Favian's last name was. *Id.*; Nov. 7, 2017 Hr'g Tr. 52:5-14; Gov.'s Ex. 8. When Defendant could not provide Officer Wood with Favian's last name, he clarified, "Well, he's my lady's, uh, husband's cousin." Video of Stop at 11:59 a.m. Defendant said Favian let him borrow his car to come over here for the weekend, and when asked where he was heading, Defendant responded, "Albuquerque." Tr. of Stop 3:5-8….

Sergeant Chavez and Officer Wood searched the interior of Defendant's car where they found two large bundles of heroin and a firearm. *Id.* 115:8-9, 174:7-21.

Mem. Op. and Order 3-4, 12, ECF No 107.

The Court has also considered evidence introduced at the James Hearing. The Court heard the testimony of Special Agent Jose Ramon Martinez, a law enforcement officer with the Department of Homeland Security, who the Court finds credible and finds has specialized knowledge through his training and experience with drug trafficking practices and patterns and the use of code words. *See* James Hr'g Tr. 5:12-10:22. The Court finds the following facts proven by a preponderance of the evidence.

Special Agent Martinez's first language is Spanish, he understands and speaks Spanish daily in his personal life and often when investigating crimes, and he has received his proficiency in Spanish language by the Department of State. *See id.* Special Agent Martinez translated the text messages from Defendant's phone into English fairly and accurately using his knowledge and experience in the Spanish language and in drug trafficking investigations, as well as using information from the cell phone: contact information, photographs, emails, telephone calls, video, text messages, videos, and geo-location data. *See* James Hr'g Tr. 14:1-23. The summary charts in Exhibits 141, 141A, and 141B show Special Agent Martinez's Spanish to English translations of text messages from March 2, 2016 to March 25, 2016, extracted from Defendant's cell phone and placed in chronological order. *See id.* at 32:15-34:1, 49:5-12.

Law enforcement conducted a forensic examination of the cellphone seized from Defendant's person on March 25, 2016, which revealed numerous photographs, emails, text messages, records of phone calls, and GPS geo-location data. *See* James Hr'g Tr. 11:1-14:23, 20:14-22:13, 23:18-24:12. The sum contents of the cellphone established that the cellphone is Defendant's and Defendant took a trip on March 4 through 6, 2016 ("Trip 1"), on March 19 through 21, 2016 ("Trip 2"), and on March 25, 2016, when drugs and the cell phone were seized from the vehicle Defendant was driving. *See supra*; James Hr'g Tr. 11:1-14:23, 20:14-22:13, 23:18-24:12.

"Favian" is listed in Defendant's cellphone contact list for the phone number (480) 479-7096, and Defendant kept in contact with Favian in each of the three trips. *See id.* at 20:14-22, 26:20-27:10. Law enforcement confirmed through a subpoena for the phone number that the phone number belonged to Hector Reyes, Favian Reyes's brother. *See id.* at 28:1-9. Hector Ramirez Reyes registered the vehicle in which drugs were seized from Defendant. *See id.* at 27:11-25.

In text messages beginning on March 2, 2016 at 8:32 p.m. through 9:00 p.m., Favian and Defendant discussed if Defendant was going to work on Friday (March 4), and they arranged payment and a meeting on March 3, 2016. *See* Ex. 141; James Hr'g Tr. 34:15-36:6. Defendant asked how many tickets he can get, which is a common drug trafficking term. James Hr'g 35:5-22; Ex. 141. Additional text messages extracted from Defendant's cell phone between Defendant and "Favian" beginning on March 3, 2016 at 8:31 p.m. through 10:23 p.m. suggest they were arranging a meeting and met that night. *See* Ex. 141; James Hr'g 36:7-13.

Text messages on March 4, 2016 starting at 4:56 a.m. through 11:35 a.m. involve Favian and Defendant discussing the trip and status updates. *See* Ex. 141. At 4:56 a.m., Defendant texted Favian, "I did not work today, as soon as you have the dark sunglasses let me know." *Id.* In Special Agent Martinez's training and experience, "dark sunglasses" is a reference to heroin. *See* James Hr'g Tr. 36:16-39:1. Drug traffickers often use color codes to refer to the type of drug they are trafficking, and there is no reason to use the adjective "dark" with "sunglasses" when all sunglasses are dark. *See id.*

At 8:48 a.m., Favian texted Defendant: "What happened is that I am for the guy to open that is going to fix the window that is not working." Ex. 141. In Special Agent Martinez's opinion, the window may refer to the load vehicle needing to be fixed, so Favian and Defendant were discussing when it will be ready. James Hr'g Tr. 39:3-40:7. At 11:04 a.m., Defendant texted Favian, "Go go the suit case is at the door bro," and then Favian acknowledged by text that he will be there in five minutes. Ex. 141. Photographs taken by Defendant beginning on 12:21 p.m. on March 4, 2016 show he was driving. *See id.* Text messages, photographs, e-mails, and geo-location information show that Defendant took a trip from March 4 and March 6, 2016, from Phoenix,

Arizona, through Las Vegas, Nevada, up to Salt Lake City, and then returned to Las Vegas, Nevada, back to Phoenix. *See* James Hr'g Tr. 11:3-19:25, 19:2-10.

On March 4, 2016 at 4:06 p.m., Defendant took a photograph of a Tacos El Gordo restaurant in Las Vegas, Nevada. *Id.* at 16:6-14. Ex. 141. At 7:50 p.m., Defendant received a booking reservation made by "Eliana Rodriguez" for a hotel in Cedar City, Utah. Ex. 141. Eliana Rodriguez is the mother of Defendant's child. James Hr'g Tr. 42:17-18. Law enforcement later determined that Eliana Rodriguez purchased the firearm seized from Defendant on March 25, 2016. *Id.* at 41:21-24. On March 4, 2016, at 9:17 p.m., Defendant took a photograph of himself with a firearm. Ex. 141; James Hr'g Tr. 11:16-12:9. Carrying firearms is common during drug trafficking for safety and to defend the valuable narcotics. James Hr'g Tr. 12:10-22.

On March 5, 2016, beginning at 1:57 a.m. until 6:51 a.m., Favian sent text messages to Defendant asking how it is going and telling him to be careful on his travel. Ex. 141. These messages are consistent with a drug supplier checking on the status of his courier. James Hr'g Tr. 43:2-20. At 9:33 a.m., Defendant texted Favian he will arrive in 40 minutes, and then he texted Favian at 9:54 a.m. telling him he was here. Ex. 141. Favian responded at 10:01 a.m. with a phone number, 801 835 4793. *Id.* Defendant called the phone number. *Id.* At 10:19 a.m., Defendant received an incoming call with a location to meet at a Wal-Mart. *Id.* Special Agent Martinez subsequently confirmed that the location given on the text message was the location of Wal-Mart in West Valley, Utah, a suburb of Salt Lake City. *See* James Hr'g Tr. 15:1-15, 44:17-23. A series of phone calls between Defendant and the phone number and Defendant and Favian occurred over the next hour. Ex. 141. These communications are consistent with a drug supplier helping to ensure his courier is making the delivery. *See* James Hr'g Tr. 44:24-45:13.

On March 5, 2016, at 12:56 p.m., Defendant took a photograph of a Holiday Inn south of Salt Lake City. Ex. 141; James Hr'g Tr. 16:15-17:3. Special Agent Martinez subsequently travelled to the Holiday Inn and confirmed the photograph matched that of the Holiday Inn near Salt Lake City. James Hr'g Tr. 17:5-11.

On March 5, 2016, between 1:45 p.m. and 1:49 p.m., Favian asked Defendant by text, "Are you done?" Ex. 141. Defendant responded, "Ya," and "I am on my way out." *Id.* Favian texted Defendant to be careful and asked if they gave him the tickets. *Id.* Tickets are code words for money. *See* James Hr'g Tr. 46:4-13. These communications were consistent with status updates. At 4:58 p.m., Defendant took a photograph of a sign marking the Arizona and Utah state line. Ex. 141; James Hr'g Tr. 17:12-18:6. Special Agent Martinez subsequently travelled through the location, verifying it was the same sign as in the photograph. James Hr'g 17:25-18:3. At 5:08 p.m., Defendant entered a GPS location request in his cell phone for a destination in Las Vegas, Nevada, and when he did so, GPS coordinates were retrieved by his cell phone of his location at that time in an area near Las Vegas, Nevada. *See id.* at 18:7-19:1.

Text messages sent by Defendant to Favian, beginning at 8:45 p.m., indicated that he was returning to Phoenix. *See* Ex. 141; James Hr'g Tr. 46:17-47:6. Defendant indicated that his trip was a success by texting Favian at 8:45 p.m., "Start putting them on ice, I am almost there." *See id.* This text is a celebratory type of text meaning to get the beers ready. *See id.* At 11:33 p.m., Favian checks on his location, and they exchanged texts between 11:34 p.m. and 11:55 a.m. as to where Defendant was and that Favian was waiting. *See* Ex. 141. On March 6, 2016, at 12:30 a.m., Defendant texted Favian, "Bro pay attention to the bills, I got one here that is bad." *Id.* Favian responded by text that he will exchange it, but Defendant replied, "It's not a problem bro, I am saying it just in case there is more in the bunch." *Id.* They discuss trading it out anyway. *Id.* Special

Agent Martinez testified that bills in this context means money and indicates they were dealing in bulk cash and that there may be counterfeit bills within the bunch of cash. *See* James Hr'g Tr. 47:17-48:17.

Defendant's phone extraction also shows evidence that "Favian" helped Defendant plan a second trip in which Defendant traveled from Phoenix, Arizona, to Las Vegas, Nevada, to Salt Lake City, Utah, to Denver Colorado, to Albuquerque, New Mexico, and then back to Phoenix. *See* James Hr'g Tr. 21:14-22:13. A text message from Favian to Defendant on March 16, 2016 at 9:52 p.m. said: "Planning for a trip for Friday, what do you think?" Ex. 141A. Defendant responded a minute later to Favian: "You said it!! I get out of work Friday at 6pm if that works out, what do you think old man?" *Id.* At 9:58 p.m., Defendant texts Favian to throw some CDs in there, "the ones that are in the charger and the one that is in the Cherokee, please." *Id.* Special Agent Martinez testified that law enforcement conducted registration queries and determined Hector had two DMV records in Arizona, one for a Dodge Charger, and one for a Jeep Cherokee. James Hr'g Tr. 51:5-12. The contents of the texts indicated that Favian was in possession of the vehicle and preparing it for the trip. James Hr'g 51:2-18.

The text messages in Hearing Exhibit 141A show a series of text messages on March 16, 2016 starting at 9:52 p.m. through March 18, 2016 at 4:03 p.m. in which Favian and Defendant discussed arrangements for meeting and for the trip. Defendant's text 3/18/2016 2:54 p.m. indicates he was going to swing by at 5:30 or 6 and was ready to go on the trip. *See* Ex. 141A; James Hr'g Tr. 52:6-17. At 3/18/2016 4:01 p.m. Favian texts Defendant: "Bro, that the umpire says that after all we would be going for the cards only. What do you think?" Ex. 141A; James Hr'g Tr. 52:21-53:4. Special Agent Martinez testified that "cards" mean "money," which he explained indicated that on one of the trips he would be picking up money. James Hr'g Tr. 53:5-

11. The term "umpire" in Special Agent Martinez's experience refers to someone higher up the chain. *Id.* at 30:3-13. Defendant at 4:03 p.m. asks, "How much wil I get out of the equipment/team?" Ex. 141A. Special Agent Martinez understood that question to mean that Defendant was asking how much he can take from the money he picks up. James Hr'g Tr. 53:9-18.

On March 19, 2016, beginning at 12:52 a.m. through 12:26 p.m., Favian and Defendant exchanged text messages about where Defendant is and if he has arrived. *See* Ex. 141A; James Hr'g Tr. 53:19-55:1. Defendant took a series of photographs of locations while he was driving. Ex. 141A. At 12:18 p.m., after Favian asked, "What's up bro, almost?" Defendant replied, "Almost bro, no pressure no pressure!!!" and asked if Favian still didn't trust that he would go and come back. Ex. 141A. Because drug suppliers are concerned with a transporter stealing the drugs or money, it is common that there is a certain level of trust needed between the transporter and sender of the narcotics. James Hr'g Tr. 54:17-55:1.

At 12:24 p.m. on March 19, 2016, Favian sent a text to Defendant asking, "Oh ok, more or less what time do you think you will arrive with my cousin?" Ex. 141A. Defendant responds, "1 1:30 more or less," and Favian replies to be careful and give him a shout. *Id.* Defendant took additional photographs while driving, and at 2:23 p.m. Defendant texted Favian, "I arrive in 20." *Id.* Favian responded a minute later, "Okee dokee bro, I will send you the number." *Id.* At 2:41 p.m., Favian sent: "345 299 12XX and tell him you are there for the tickets." *Id.* Defendant called the number twice, and they then discussed by text that it was the wrong number. *Id.* Favian sent him another phone number, 801 835 47XX, which is the same phone number he contacted in Trip 1. *See id.* & James Hr'g Tr. 55:22-56:5. Defendant and Favian exchanged texts between 3:16 p.m. and 3:32 p.m. about no one answering the phone. Ex. 141A; James Hr'g Tr. 56:3-9. At 3:38 p.m.,

Favian texted Defendant: "They sent to look for the young man, they will let me know what's up in a little bit." Ex. 141A. Another series of phone calls occurred between Favian and Defendant, and then at 4:49 p.m., Defendant asked "My Queen" to look for a Best Western in Salt Lake City. *See id.* at 141A. At 6:02 p.m., Defendant received a booking confirmation for an Econo Lodge in Provo, Utah, for accommodation that night. *See id.*; James Hr'g Tr. 56:16-24. Special Agent Martinez confirmed that a photograph Defendant took on March 19, 2016 at 7:04 p.m. was of a Chevron gas station in Provo, Utah, taken from the vantage point of an Econo Lodge hotel, the same hotel that matched the booking confirmation. Ex. 141A; James Hr'g Tr. 22:23-23:17. Favian and Defendant exchanged a series of text messages from 7:40 p.m. to 7:53 p.m. in which he checked on Defendant's status. *See* Ex. 141A.

On March 20, 2016, at 12:33 a.m., Defendant told Favian, "I am going to the place with yadi." Ex. 141A. Favian responded, "Ok bro, be careful." *Id.* Defendant took a series of additional photographs of his trip as he traveled. *Id.* Special Agent Martinez confirmed that one of the photographs taken 3/20/2016 8:39 AM was of Hanging Lake Tunnel west of Breckenridge, Colorado, as one drives toward Denver. James Hr'g Tr. 24:13-24.

Defendant texted Favian at 9:14 a.m. on March 20, 2016, "Arrive in two hours at the latest." Ex. 141A. This text message fits the common drug trafficking pattern of a drug transporter indicating that he is ready for the next part. James Hr'g Tr. 57:24-58:7. At 11:56 a.m., Favian sent Defendant a message, "720 692 3656 el mochomo." Ex. 141A. This text message fits the common drug pattern of sending the contact information for the meet. *See* James Hr'g Tr. 58:8-59:1. After a series of phone calls occurred at 12:02 a.m. between Defendant and the number and between Defendant and Favian, at 12:44 p.m., Favian sent another text message, "720 692 1865 call this guy." Ex. 141A. From 12:45 p.m. to 12:50 p.m., Defendant and Favian exchanged text messages

about what Defendant was doing. *Id.* Phone data showed a series of phone calls between 720 692 1865, Favian, and Defendant around 1:17 p.m. *Id.* At 6:24 p.m., Defendant sent a text to "Tony" that he would not be into work because he was in Colorado and would not return until Tuesday morning. *Id.* At 6:28 p.m., Defendant had a series of phone calls with 720 692 1865, 720 692 3659, and Favian. *Id.*

On March 21, 2016 at 8:02 a.m., Defendant texted Favian, "I arrive in 40 to Albuquerque, I'll eat breakfast and leave bro." *Id.* At 8:12 a.m., the geo-location data indicated that Defendant's cell phone was in Albuquerque, New Mexico, and he was seeking directions to Phoenix, Arizona from that location. Ex. 141A; James Hr'g Tr. 25:12-25. A series of photographs from Defendant's phone show that he drove from Nine Mile Hill westbound along I-40. *See* Ex. 141A; James Hr'g Tr. 26:1-10. On March 21, 2016, Defendant send Favian at text at 11:57 a.m., "Put them on ice!!" Ex. 141A. This text is a similar celebratory type of text as Defendant made in Trip 1. *Compare id.*, *with* James Hr'g Tr. 29:16-20, 46:17-24. Beginning at 11:58 a.m. through 2:38 p.m., Defendant and Favian exchanged text messages regarding meeting up at the house. Ex. 141A. At 4:09 p.m. Favian texted Defendant, "Bro so the score 50 for salt lake and 90 for closed color, was that the score that they gave you at each one?" *Id.* Special Agent Martinez testified that this text is code for picking up 50,000 in Salt Lake City and then 90,000 in Colorado. James Hr'g Tr. 30:16-24, 59:14-20. Defendant concurred, "Yes oldman." Ex. 141A.

Defendant and Favian texted again about meeting on 3/23/2016 8:16 p.m. Ex. 141B. The next day, on March 24, 2016 at 4:36 p.m., Defendant texted Favian, "I leave in about an hour old man, I'll call you getting to Phoenix." *Id.* After exchanging texts about how Favian was, Defendant asked, "What do you say old man is the airplane ready?" *Id.* Favian replied, "Ready." *Id.* "Airplane" is a code word for the load vehicle. James Hr'g Tr. 60:2-8. Text messages beginning

6:28 p.m. indicate a meeting between Defendant and Favian occurred and they exchanged texts regarding Defendant keeping Favian apprised of his status. Ex. 141B. Defendant took a photograph of himself driving on March 25, 2016 at 7:38 a.m., and he texted Favian his status at 7:41 a.m.: "Everything good brother!" *Id.* Later that day, Officer Wood stopped Defendant for speeding and discovered heroin and a firearm in the Dodge Charger he was driving, which Defendant told Officer Wood belonged to "Favian." *See supra*.

The evidence of Defendant's first, second, and third trips fit the general pattern of a courier, Defendant, maintaining communication with his source of supply, Favian, to ensure the delivery of the high value narcotics. *Compare* James Hr'g Tr. 7:6-9:24, with facts cited *supra*. Drug couriers often use third-party vehicles to protect the sender and courier. James Hr'g Tr. 8:7-14. Defendant's use of third-party vehicles fits that pattern. *See id.* at 29:1-6. Drug sources frequently keep the buyer updated as to the situation of transportation, and the communications between Favian and Defendant while Defendant was traveling fit that pattern. *Compare* James Hr'g Tr. 8:15-9:1, 29:4-16, *with* facts cited *supra*. Code talk is common in drug trafficking, and the text messages between Favian and Defendant utilized code words. *Compare* James Hr'g Tr. 7:1-9:4, 21:1-3, 30:3-24, *with* facts cited *supra*. Often, the courier will not know the final destination for the narcotics, so as to protect the buyer in case the narcotics are seized by law enforcement. *See* James Hr'g Tr. 9:7-24. In such occasions, the courier is given the final information as to the destination of the transaction only when near the destination city, a pattern seen in each of Defendant's first two trips when Favian sent Defendant a contact number when he was close to arriving. *Compare* James Hr'g Tr. 9:7-24, 13:1-25, 21:4-13, 29:4-13, *with* facts cited *supra*. The number of communications between Favian and Defendant were higher than normal during the time periods of arranging and Defendant taking the trips. *See id.* at 26:20-27:2, 28:22-25, 49:2-8. Special Agent Martinez also did not

observe any evidence in Defendant's cell phone of photographs or other information indicating he went on his first two trips as a tourist or to visit family. *See* James Hr'g Tr. 20:1-10, 32:7-14.

## B. Conclusions of Law

### 1. Existence of Predicate Conspiracy

Based on all of the evidence, the Court concludes that the Government has established by a preponderance of the evidence the existence of a conspiracy to distribute narcotics from March 2, 2016 through March 25, 2016. Although the Government has not presented direct evidence of specific drugs involved in Trip 1 and Trip 2, the evidence presented regarding all the communications before, during, and immediately after Trips 1 and 2; the communications between Defendant and Favian before Trip 3; the photographs taken documenting the trips; the reference to "dark sunglasses" that can be code for heroin; the use of other drug trafficking code words; the seizure of heroin on March 25, 2016; Defendant's use of a vehicle on March 25, 2016 linked to "Favian;" and his statements to Officer Wood regarding "Favian;" as well as other evidence, taken together meets the preponderance standard of evidence of a conspiracy to distribute narcotics from March 2, 2016 through March 25, 2016.

### 2. Defendant, Favian, and Unnamed Others Were Members in the Conspiracy

Based on all the evidence, the Court concludes that the Government has proven by a preponderance of the evidence that "Favian" and Defendant were members of a conspiracy to distribute narcotics on March 2, 2016, through March 25, 2016. *Cf. United States v. Alcorta*, 853 F.3d 1123, 1142 (10th Cir. 2017) (holding that non-hearsay evidence was more than adequate to link defendant to conspiracy where "evidence included (1) documents bearing Defendant's name found in the vehicle that Vega and Salazar were driving, (2) Defendant's 25 phone calls to Adrienne on the day of her arrest, (3) his own June flight to Kansas City, where the drugs were delivered,

and (4) all the phone calls in which Defendant participated and his text messages with Vega and Salazar before their arrests, which were admissible against him under Rule 801(d)(2)(A) as statements by an opposing party").

The Government also seeks to admit as a coconspirator statement in the Trip 1 summary exhibits a text message from the phone number 801-835-4793 to Defendant on March 5, 2016 at 10:19 a.m. stating: "5600west6200sout Walmart, I will pass by there and you can follow me, let me know when you are at the parking lot." To be admissible, the United States must establish independent evidence that the person using 801-835-4793 was part of the conspiracy, in other words, "evidence other than the proffered [coconspirator] statements themselves." *Owens*, 70 F.3d at 1125. The evidence concerning this number, apart from the statement itself, is that "Favian" sent Defendant the number at 10:01 a.m., Defendant called the number at 10:01 a.m., Defendant texted at 10:19 a.m. that he acknowledged the above text from the number, Defendant received a call from the number at 10:31 a.m., Defendant called the number at 10:54 a.m., and Defendant received three calls from the number at 10:59 a.m., 11:01 a.m., and 11:19 a.m. Shortly thereafter, on March 5, 2016, Defendant texted Favian between 1:45 p.m. and 1:49 p.m., acknowledging that he was done and had the tickets, which is code for currency. This evidence, combined with the totality of the evidence upon which the Court relied to find that Favian and Defendant were members of the conspiracy, is sufficient to establish by a preponderance of the evidence that the person using 801-835-4793 at the time of the text to Defendant was a member of the conspiracy.

### 3.    Statements Were Made During and in Furtherance of Conspiracy

Based on all of the evidence, the Court finds by a preponderance of the evidence that all but the below excepted statements proffered by the Government from "Favian" and the person using 801-835-4793 at the time of the text to Defendant were made by a co-conspirator during and

in furtherance of the conspiracy to distribute narcotics. Each statement was made for one of the purposes listed in *Rutland*, including the following: arranging the trips, arranging meetings with the unnamed persons linked to the phone numbers Favian provided, getting and providing updates regarding the trips, identifying another member of the conspiracy who Defendant was to meet, identifying a location to meet, suggesting the success of the trip's purpose and a meeting (e.g. "Start putting them on ice, I am almost there"), and discussing possible problems with the bills received. *Cf. Alcorta*, 853 F.3d at 1141 (holding statements "could reasonably be viewed as in furtherance of the ongoing conspiracy because they comforted coconspirators that they would be taken care of (so that they would perform their tasks and remain loyal), kept coconspirators advised of the ongoing investigation (so that they could take proper precautions and make appropriate plans), or helped them execute their tasks").

The Court, however, is not convinced that the following text messages set forth in Trial Ex. 141A were in furtherance of the conspiracy: Text messages between Favian and Defendant on March 12, 2016, through March 16, 2016 at 9:50 p.m. are not by their content or by other evidence linked to Trip 2 to show they were made in furtherance of the conspiracy. Although Special Agent Martinez testified that he believed the "requested item" referenced in a text was a drug reference, *see* James Hr'g Tr. 68:21-24, and there was the term "fuse" used by Defendant, there was no testimony explaining the basis for believing those were code words for narcotics or currency, *see id.* at 50:1-11. Nor does the content of the texts appear to necessarily be linked to Trip 2. Instead, Special Agent Martinez noted that the message that caught his attention most was the text on March 16, 2016 at 9:52 p.m.: "Planning for a trip for Friday, what do you think?" *Id.* 50:14-20. The texts thereafter indicate coordination and planning for Trip 2, and then texts regarding Defendant taking the trip. Additionally, the 9:52 p.m. text message suggests that the prior text messages were not

related to Trip 2 because Favian seems to be first proposing the trip to Defendant in this message when he says he is planning "for *a* trip for Friday," not "the trip" or some other language indicating they had discussed it previously. The Government has thus not yet shown by a preponderance of the evidence that the text messages from 3/12/2016 9:01 a.m. to 3/16/2016 9:50 p.m. were in furtherance of the drug conspiracy. In contrast, the Government has met its burden to show the text messages starting 3/16/2016 9:52 a.m. and the texts thereafter in Ex. 141A were made in furtherance of the drug conspiracy.

### 4. Whether statements are testimonial

Defendant asserts that he has no information about whether "Favian" made the statements or if he was acting under the guidance of law enforcement as an informant acting to create evidence against Defendant in a prosecution. There is no evidence indicating that "Favian" was acting as a government agent or informant at the time he sent the text messages. The Confrontation Clause of the Sixth Amendment applies to testimonial statements, which at a minimum, constitute "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The Court concludes that the evidence the Government has proffered do not include testimonial statements that implicate the Confrontation Clause.

### 5. Admissibility of Co-Conspirator Statements

The Court concludes that the proffered coconspirator statements that were made during and in furtherance of the drug conspiracy from March 2, 2016 through March 25, 2016, are admissible against Defendant as non-hearsay under Rule 801(d)(2)(E), except for the the text messages from 3/12/2016 9:01 a.m. to 3/16/2016 9:50 p.m.

### C. Admissibility of Other Statements

1.      **Statements by Defendant are Admissible as Statements by Party Opponent**

Defendant argues that the Government has failed to establish that Defendant made the text messages, and thus, the Government has not established the foundation for their admission. A statement is not hearsay if it is offered against a party and is the party's own statement. *United States v. Brinson*, 772 F.3d 1314, 1320 (10th Cir. 2014) (citing Fed. R. Evid. 801(d)(2)(A)). "Proponents of the evidence need only show by a preponderance of the evidence that the opposing party had made the statement." *Id.*

The evidence presented at the hearing showed that the text messages were extracted from the phone found in Defendant's sole possession, and the extraction showed numerous "selfie" photographs of Defendant. The Government has established by a preponderance of the evidence that the text messages sent from Defendant's phone for which it seeks admission were sent by Defendant. *Cf. United States v. Brinson*, 772 F.3d 1314, 1320-21 (10th Cir. 2014) (holding that introduction of Facebook messages were admissible as statements by party opponent where government put on evidence of registration of email address, identification of himself in one message, witness identification testimony that defendant used the name, and a bill of sale with matching contact number of alias). Accordingly, Defendant's outgoing text messages are admissible as statements by a party opponent.

Defendant also argues that texts to "Tony Navarro" are irrelevant. The entry at 3/5/2016 12:13 p.m. to "Tony Navarro" says, "I'm out of town primo." This entry is relevant to the Government's theory that Defendant travelled out of town during the time it asserts he was trafficking drugs. The entry at 3/20/2016 6:24 p.m. is "Defendant to Tony H: Hey Tony, this is Aaron Mercado just want to let you know I'm not going to make it to work tomorrow Monday, I

have a family emergency out here in Aspen Colorado I'll be in Tuesday morning thanks!" Again, the statement is relevant to whether Defendant was traveling.

### 2. Hotel Receipts

Exhibits 141, the Trip 1 summary, at entry 3/4/2016 7:50 p.m. contains what on its face is a booking reservation for America's Best Value Inn, Cedar City, made for March 4, 2016. Exhibit 141A, the Trip 2 summary, at entry 3/19/2016 6:02 p.m. contains a reservation confirmation email for an Econo Lodge motel in Provo, Utah with check-in on Saturday March 19, 2016. Defendant argues that the computer printout is not admissible because the Government has not established the foundation under Rule 803(6), the business record exception. The Government intends to introduce this evidence under the business records exception using the respective custodians of records for the inn and lodge. The Court will reserve ruling on the admissibility of the hotel receipts until trial.

### 3. Statements by Hermosa Daya and "La Chingona"

Defendant contends that the statements by Ms. Daya and "La Chingona" are hearsay to prove the truth of the matter asserted, i.e., that Defendant was in Las Vegas. During Trip 1 on 3/4/2016 at 2:55 p.m., Hermosa Daya asked Defendant, "Aren't you suppose to go to Vegas?" Ex. 141. Defendant responds, "Corazon I'm about 30 minutes from Vegas and trust." *Id.* Questions are not assertions and therefore are not hearsay. *Alcorta*, 853 F.3d at 1141 ("Other 'statements' were not *statements* as defined by Fed. R. Evid. 801(a) because they were not intended as assertions; they were questions or requests.") (internal footnotes omitted). The question also provides context for Defendant's admissible statement as to his location. At 5:06 p.m. and 5:54 p.m. that same day, Defendant texted La Chingona twice regarding his location. Ex. 141. These are statements by a party opponent and thus are admissible.

During Trip 3, at 3/25/2016 11:21 a.m., Hermosa Daya asked Defendant, "Are you in a room"? Ex. 141B. Defendant responded, "No love I'm driving." *Id.* Hermosa Daya responded, "Oh where to," and Defendant replied, "Colorado." *Id.* Again, the text messages from Hermosa Daya are questions, not statements, and are admissible for context for Defendant's statements.

### 4.      Google Map Entries

The summary exhibits also contain Google maps for certain GPS coordinates. Special Agent Martinez testified that the GPS coordinates were retrieved from Defendant's cell phone when Defendant entered geolocation information searching for directions. *See* James Hr'g Tr. 18:7-11, 25:5-25. The entry of GPS coordinates by Defendant, to the extent they would be considered statements, are admissible as a statement by a party opponent. The automatic computer-generated automatic retrieval of Defendant's location is not a statement and is not hearsay. Therefore, the raw, underlying data is admissible as substantive evidence; however, the way the data appears in the version of the Government's exhibits shown at the hearing are images created by the Government and should only be used for demonstrative purposes in that form.

### 5.      Photograph Captions

The summary exhibits also include photographs and captions. The photographs taken by Defendant and included in the exhibits are data extracted from Defendant's phone and admissible. However, captions not part of the underlying data were created by the Government and should not be included in summaries the Government intends to admit as substantive evidence. For example, 3/4/2016 9:17 p.m. "Picture Taken: Defendant with firearm." The Court discussed this issue with counsel at the hearing, and the Government offered to delete the captions in the summaries they intend to offer for admission under Rule 1006. Captions that fairly and accurately represent the evidence at trial, however, may be permissible for demonstrative purposes.

### 6. Description of Incoming/Outgoing Calls and Texts

The summary exhibits also contain content concerning the incoming/outgoing calls and text messages that were not all taken directly from the underlying data. For example, "SMS outgoing Defendant to Favian." The Court addressed this issue with counsel at the hearing, noting that such descriptions, if supported by the record, are permissible for use in a demonstrative exhibit, but that a summary that goes into the jury room is different. *See* James Hr'g Tr. 70:15-71:1. After the hearing, the Government submitted United States' Amended Notice of Supplemental Information Pertaining to Exhibits 137, 138, and Summary Charts 141, 141A, and 141B (ECF No. 211). In the Amended Notice, the Government provided an example of the exact reproduction of the evidence and what the Government formatted in its proposed summary exhibits. *See id.* at 5. For summary exhibits that the Government intends for the jury to consider as an exhibit during its deliberations, the Court finds that the summary exhibits should contain the exact reproduction. As the Court stated at the hearing, the rules for demonstrative aids are different, so fair and accurate descriptions may be used in demonstrative aids. *See United States v. Hohn*, 606 F. App'x 902, 909 (10th Cir. April 1, 2015) ("Absent abuse which clearly prejudices the defendant, the district court has discretion to permit the display of demonstrative exhibits during trial.").[1]

### III. Summary Rule

Defendant asserts that the complete record of the extractions, if redacted to omit irrelevant and prejudicial portions, could be as few as 517 pages. Defendant asserts that the evidence is not

---

[1] **Notably, when parties present exhibits to the jury from a laptop, the jury often can see the parties' description of files. The Court asks the parties to take care that descriptions in their laptops of evidence and exhibits not contain inaccurate or argumentative information viewable to the jury.**

voluminous enough for summary charts to be needed, and the charts will be unfairly prejudicial. Even assuming Defendant's number of non-redacted pages more accurately reflects the amount, the Court finds that the number of phone extraction pages are "voluminous" within the meaning of Rule 1006, and that summary exhibits will help the jury understand the relevant underlying evidence. In its Amended Notice, the Government explained it intends to use exhibits 100, 100A, 100B, 104, 104A, and 104B as demonstrative aids for the jury to establish the foundation for Exhibits 141, 141A, and 141B. The United States seeks a pretrial ruling admitting Exhibits 141, 141A, and 141B as substantive evidence. The Court will therefore turn to the specific exhibits at issue.

### A. Trip 1 – Exhibits 100 and 104

Exhibit 100 contains text messages and photographs extracted from the cell phone seized from Defendant, spanning March 2, 2016, through March 6, 2016. Exhibit 104 contains the same extracted data as Ex. 100 and includes the hotel receipt and the Google map entry described above.

Assuming the foundation established at trial will reflect that in the hearing, the Court will provisionally allow the use of Exhibit 100 as a demonstrative aid. As for Exhibit 104, the Court will reserve ruling until trial regarding the admissibility of the hotel receipt, and thus, the Court will reserve ruling on the admissibility Exhibit 104. The Court notes that, should the Government wish to admit Exhibit 100 as substantive evidence, it will only be admitted if the information in the summary is the exact evidence taken from the underlying documents, subject to the redactions and restrictions described above.

### B. Trip 2 – Exhibits 100A and 104A

For the reasons given above, because the Government did not meet its burden at the hearing to establish the admissibility of text messages between Favian and Defendant on March 12, 2016,

through March 16, 2016 at 9:50 p.m., the Court will exclude the text message entries up until the first admissible entry of March 16, 2016 at 9:52 p.m. Assuming the foundation established at trial will reflect the evidence in the hearing, the Court will permit the use of Exhibit 100A as a demonstrative aid, subject to the requisite redactions. The Court notes once more that, should the Government wish to admit Exhibit 100A as substantive evidence, it will only be admitted if the information in the summary is the exact evidence taken from the underlying documents, subject to the redactions and restrictions described above. As for Exhibit 104A, it contains the hotel receipt for which the Court will reserve ruling on its admissibility until trial. The Court will therefore reserve ruling on the admission of Exhibit 104A.

### C. Trip 3—Exhibits 100B and 104B

Assuming the foundation is established at trial, the Court will permit the use of Exhibits 100B and 104B as demonstrative aids. Substantive admission will require an exact replica, subject to the redactions and restrictions described *supra*.

### D. Summary Chart Exhibits 141, 141A, and 141B

Summary Charts Exhibits 141, 141 A, and 141B contain the same extracted data as the 100, 104, 100A, 104A, 100B, and 104B summary exhibits, respectively, but in addition, contain the Spanish to English translations of the text messages by Special Agent Jose Martinez. The Court in a prior Memorandum Opinion and Order, permitted the introduction of the translations, subject to the proper foundation being laid at trial. Defendant, however, objects to some of the translations and will present evidence of alternative translations.

The Court expressed concerns at the hearing about a side-by-side translation unduly influencing the jury as to which version of the disputed translations was more accurate. *See* James Hr'g Tr. 74:11-23. The Government noted at the hearing that the defense has prepared an exhibit

that is also side-by-side translations and provided an example of Defendant's proposed exhibit in its Amended Notice, ECF No. 211 at 6. Given that both parties will present to the jury side-by-side exhibits of the text messages and their respective translations, the Court finds it would be useful for the jury to have side-by-side translations of the competing versions as substantive evidence. However, for Exhibits 141, 141A, and 141B to be admitted as evidence for use in deliberations, the English contents should be exact replicas of the underlying extractions. Because the Court does not at this time have exhibits that conform to the Court's stated expectations for admissibility as substantive evidence, the Court will reserve ruling until trial. The exhibits in their current form may be used as demonstrative aids, assuming the foundation is established of the accuracy of the contents.

### E.  Exhibits 137, 137A, 138, and 138A

At the hearing, the Government admitted for purposes of the hearing Exhibits 137 and 138, maps created of Defendant's first two trips, using photographs, geolocation information, and other extracted data. In its Amended Notice, the Government explained changes it intended to make following the hearing concerning Exhibits 137 and 138 and stated that it proposed admission of 137A and 138A, the amended exhibits, as substantive evidence and to use the original Exhibits 137 and 138 as demonstrative aids. Both the original and amended versions of 137 and 138 were prepared by the Government to synthesize and explain the underlying evidence in a visually simpler form. The Court finds that exhibits 137, 138, 137A, and 138A will be admitted only as demonstrative aids.

### F.  Underlying Exhibits

So long as the admitted exhibits contain a version of the exact replica of the underlying exhibits, there is no need to present to the jury all the underlying voluminous records. However, if

the jury is only presented demonstrative aids that edit the underlying data, then the underlying exhibits should be admitted so the jury has the tools to compare the metadata to what is in the summary exhibits.

**IT IS THEREFORE ORDERED** that the United States' Motion in Limine to Admit Summary Charts Pursuant to Fed. R. Evid. 1006 and Fed. R. Evid. 801(d)(2)(E), and Fed. R. Evid. 801(d)(2)(A)" (**ECF No. 189**) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. The Court **GRANTS** the United States' request to use the following exhibits **as demonstrative aids during trial: Exhibit 100, 100A, 100B, 104B, 137, 138, 137A, and 138A so long as text messages between Favian and Defendant on March 12, 2016, through March 16, 2016 at 9:50 p.m. are redacted**.

2. The Court **DENIES** admission of text messages between Favian and Defendant on March 12, 2016, through March 16, 2016 at 9:50 p.m.

3. The Court **RESERVES RULING** on the admissibility of **Exhibits 104, 104A, 141, 141A, and 141B** until trial.


_____
**JUDITH C. HERRERA**
**UNITED STATES DISTRICT JUDGE**